## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BLAINE COLEMAN,

      Plaintiff,

                                 Case No. 11-cv-15207

vs.

                                 Hon. Mark A. Goldsmith

ANN ARBOR TRANSPORTATION
AUTHORITY, MICHAEL FORD,
TRANSIT ADVERTISING GROUP AA, and
RANDY ORAM,

      Defendants.

_____/

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Attorneys for Plaintiff

_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND/OR TEMPORARY RESTRAINING ORDER

By this motion and pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiff Blaine Coleman seeks a temporary restraining order, preliminary injunction, or both, ordering defendants to accept and display plaintiff's advertisement on terms no less favorable than those given to other advertisers.

A supporting brief accompanies this motion.

Local Rule 7.1(a) requires plaintiff to ascertain whether this motion will be opposed. Plaintiff's counsel telephoned counsel for defendant Ann Arbor Transportation Authority on November 28, 2011, to explain the nature of this motion and its legal basis.  Plaintiff's counsel requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Dated: November 29, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

BLAINE COLEMAN,

      Plaintiff,

vs.

Case No. 11-cv-15207

ANN ARBOR TRANSPORTATION
AUTHORITY, MICHAEL FORD,
TRANSIT ADVERTISING GROUP AA, and
RANDY ORAM,

Hon. Mark A. Goldsmith

      Defendants.

_____/

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Attorneys for Plaintiff

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................. iv

STATEMENT OF ISSUE PRESENTED ........................................................................ v

CONTROLLING AND APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT ............ vi

INTRODUCTION ....................................................................................................1

BACKGROUND AND FACTS ...................................................................................1

    Background: Activism and Advocacy Regarding Israel and Palestine ...............................2

    AATA's Refusal To Run Blaine Coleman's Ad...................................................4

    AATA's Advertising Policy and Practice.........................................................5

    AATA Reaffirms the Decision To Reject Mr. Coleman's Ad...........................................7

LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS ....................................................7

ARGUMENT ....................................................................................................8

Plaintiff is entitled to temporary or preliminary injunctive relief because he is likely to prevail on the merits of his claim that defendants' advertising policy and their refusal to run his ad violate his rights to free expression and due process under the First and Fourteenth Amendments.......................................................................................8

    A.   It is likely that plaintiff will succeed on the merits because defendants' advertising space is a designated public forum, their advertising policy is not viewpoint neutral, and the policy is unconstitutionally vague....................................8

        1.   Defendants' refusal to run plaintiff's ad violates the First Amendment because AATA advertising space is a designated public forum where content-based discrimination is prohibited. ..........................................9

            a.   AATA's written policy is not dispositive. .............................................10

            b.   AATA's actual practice is not to enforce its written policy. .................11

            c.   AATA runs a wide array of political and public-issue ads....................11

            d.   AATA rarely rejects ads. ........................................................12

            e.   AATA's criteria for allowing or prohibiting ads is unclear....................12

2.  Even if AATA advertising space is not a designated public forum, its advertising policy is facially unconstitutional because it is not viewpoint- neutral. ........................................................................................13

3.  AATA's advertising policy is facially unconstitutional under the Fourteenth Amendment because it is void for vagueness................................15

4.  Defendants' refusal to display plaintiff's ad violates plaintiff's right to due process because the ad is not clearly prohibited by AATA's advertising policy. ........................................................................................17

B.  The remaining preliminary injunction factors favor plaintiff. ...................................19

CONCLUSION...............................................................................................................20

# INDEX OF AUTHORITIES

## Cases

*Aubrey v. City of Cincinnati*, 815 F. Supp. 2d 1100 (S.D. Ohio 1993) .........................................16

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)................................................7

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788 (1985)...........................13

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................................................19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................................18

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)...................................18

*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010) ............................................9, 13, 19, 20

*Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989)...........................................................................19

*Palmer v. City of Euclid*, 402 U.S. 544 (1971) (per curiam) ........................................................18

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009).....................................................................9

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995) ......................13

*Tocco v. Tocco*, 409 F. Supp. 2d 816 (E.D. Mich. 2005) .................................................................7

*Tyson Foods v. McReynolds*, 865 F.2d 99 (6th Cir. 1989) .............................................................19

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) ................................................................................................ passim

*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) ...........................................................18

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) .........................................................................7

## Statutes

M.C.L. § 752.362 ..........................................................................................................................6, 11

M.C.L. § 722.673 ..........................................................................................................................6, 11

## Other Authorities

American Heritage Dictionary of the English Language (5th ed. 2011) ...........................................2

Black's Law Dictionary (9th ed. 2009)..............................................................................................2

World Book Encyclopedia (2011) ......................................................................................................2

**STATEMENT OF ISSUE PRESENTED**

Whether the court should temporarily restrain and/or preliminarily enjoin defendants from refusing to run plaintiff's ad because plaintiff is likely to prevail on his claim that defendants' refusal to run his ad violates the First and Fourteenth Amendments.

**CONTROLLING AND APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT**

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
       163 F.3d 341 (6th Cir. 1998)

## INTRODUCTION

Defendants Ann Arbor Transportation Authority ("AATA") and its agents refuse to display plaintiff Blaine Coleman's advertisement on the exterior of AATA public buses because, they say, the content of the ad does not comply with their advertising policy.  Mr. Coleman, an Ann Arbor resident and political activist, brings this First Amendment lawsuit challenging that policy on its face and as applied.

The ad reads "Boycott Israel, Boycott Apartheid."  Although AATA may not like the ad, and it may be controversial, the First Amendment prohibits the government from picking and choosing between the speech it likes and the speech it would rather not see or hear.  Under First and Fourteenth Amendment law that has been clearly established in this circuit for over a decade, Mr. Coleman is entitled to temporary and/or preliminary injunctive relief.  *See generally United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998).  He therefore requests that this court order defendants to run his ad immediately on terms no less favorable than those given to other advertisers.

## BACKGROUND AND FACTS

Blaine Coleman is an Ann Arbor resident and activist who is committed to increasing public awareness about what he perceives as the second-class treatment of Palestinians by the government of Israel.  To that end, he wishes to purchase advertising space on the outside of an AATA bus for an ad that reads "Boycott Israel, Boycott Apartheid."  For years, AATA buses have carried a wide array of advertisements, including ads with messages about important social issues, ads promoting religion, and even ads supporting candidates running for public office. However, AATA refuses to run Mr. Coleman's ad.  AATA's refusal to run the ad is based on its content.  (Plaintiffs' Verified Complaint, Exhibit A, ¶¶ 14-18.)

**Background: Activism and Advocacy Regarding Israel and Palestine**

Mr. Coleman is one of many Americans who have strong political opinions about Israel and Palestine. He is neither the first nor the last such person to express his views about this issue in a variety of public forums. (*Id*. ¶ 19.)

Indeed, the relationship between the Israeli government and the Palestinian people is a subject of grave importance in international politics. It is often the subject of fierce debate at the United Nations. In the United States, candidates for public office frequently discuss their support of Israel and whether they support Palestinian statehood. (Exhibits B, C, D, and E.)

Americans are generally more supportive of Israel than Palestinians. According to a 2011 Gallup poll, 68 percent of Americans say they have favorable views toward Israel and 63 percent say they sympathize more with Israelis than with Palestinians. (Exhibit F.)

However, it is also the case that some people and organizations criticize the Israeli government for its policies regarding Palestine. For example, in December 2010, Human Rights Watch issued a report entitled "Separate and Unequal: Israel's Discriminatory Treatment of Palestinians in the Occupied Palestinian Territories." The report states that the Israeli government is responsible for a "two-tier system of laws, rules, and services" and alleges that "[s]uch treatment, on the basis of race, ethnicity, and national origin, . . . violates the fundamental prohibition against discrimination under human rights law." (Exhibit G.)

Some critics of the Israeli government's policies use the word "apartheid" to describe conditions in Palestine.[1] Among those who have used the word "apartheid" to describe the plight of the Palestinians is former President Jimmy Carter, who published a book in 2006 entitled

---

[1] "Apartheid" is an Afrikaans word and a common description of South Africa's policies of racial segregation and discrimination during the twentieth century. *See* American Heritage Dictionary of the English Language 82 (5th ed. 2011); Black's Law Dictionary 111 (9th ed. 2009); 1 World Book Encyclopedia 562 (2011).

"Palestine: Peace Not Apartheid."  Other notable public figures to have drawn analogies between apartheid in South Africa and conditions in Palestine include South African Archbishop Desmond Tutu and United Nations special rapporteur John Dugard.  (Exhibits H, I, J, and K.)

Decades ago, activists organized an economic boycott of South Africa to protest apartheid in that country.  Inspired by the boycott of South Africa, some critics of the Israeli government's policies toward Palestinians now urge a boycott of Israel.  (Exhibit L.)

Using the term "apartheid" to describe the Israeli government's treatment of Palestinians is contentious.  Many people are offended by the comparison and are opposed to any form of boycott.  Supporters of Israel frequently speak out on this important political issue.  The Human Rights Watch report was widely criticized, as was President Carter for using the word "apartheid" in the title of his book.

As with any high-profile political issue, many organizations and interest groups have launched media and public awareness campaigns to express a range of views and opinions about the Israeli-Palestinian conflict.  For example, a pro-Israel organization called the Emergency Committee for Israel recently began purchasing advertising space in newspapers and billboards criticizing President Obama for not being sufficiently supportive of Israel.  (Exhibits M and N.)

Meanwhile, those who support a boycott of Israel also express their views in public forums.  For example, an organization called the Committee for a Just Peace in Israel and Palestine expresses its message by purchasing advertising space in public transportation areas. Ads stating "End U.S. military aid to Israel" have appeared on the side and rear panels of public buses in Chicago and Portland, in subway stations in New York and Boston, and inside subway cars in Washington, D.C.  (Exhibit O.)

### AATA's Refusal To Run Blaine Coleman's Ad

Mr. Coleman also wishes to advocate a boycott of Israel by purchasing ad space on public buses.  AATA is a local unit of government that operates buses throughout the Ann Arbor area—including on and near the campus of the University of Michigan, where plaintiff believes students are likely to be inquisitive about international relations, human rights, and political activism.  AATA buses regularly display ads on their exterior rear and side panels.  These exterior bus ads represent a unique opportunity to express one's message of choice because the ad is essentially a moving billboard seen by thousands of drivers and pedestrians who cross paths with the bus.  According to the "Top 10 Reasons to Advertise on AATA Buses!" featured on defendants' website, the "unique environment of bus advertising allows for endless creative possibilities."  (Exhibit A, ¶¶ 32-36; Exhibits P, Q, and R.)

Mr. Coleman first contacted defendants in late December 2010, requesting via email information about how to purchase advertising space for the outside of an AATA bus.  He requested a copy of any rules regarding the bus ads.  He also asked how much it would cost to purchase an ad on the side or back of the bus that runs along State Street, South University, and North University on and near the University of Michigan campus in Ann Arbor.  Initially, no one responded to Mr. Coleman's email.  He sent several more emails in January requesting the same information, and he included a copy of the ad he wishes to run on the side or back of an AATA bus.  (Exhibit A, ¶¶ 37-38.)

Mr. Coleman's ad features the following message in large, bold print:

Boycott "Israel"

Boycott Apartheid

The ad also contains a cartoonish black-and-white image that depicts a skeleton-like figure holding a skull in its right hand and a bone in its left.  (Exhibit A-1.)

In February 2011, defendant Randy Oram emailed Mr. Coleman and identified himself as the president of the company that handles advertising for AATA buses.  Mr. Oram requested that all communications regarding placing an advertisement on an AATA bus be directed exclusively to him.  Mr. Oram's email stated that he could not post Mr. Coleman's ad because it was prohibited by AATA advertising policy.  (Exhibit A, ¶¶ 42-43.)

### AATA's Advertising Policy and Practice

Although Mr. Oram did not specify what about Mr. Coleman's ad violated AATA's advertising policy, he did provide a copy of that policy, which states in full:

> The AATA, by permitting commercial advertising in or on its vehicles, shelters, information material, buildings, and benches, does not thereby intend to create a public forum.  Further, AATA requires that such advertising comply with specified standards to further the purposes of providing revenue for AATA, increasing ridership, and assuring that AATA riders will be afforded a safe and pleasant environment.  AATA reserves the right to approve all advertising, exhibit material, announcements, or any other display and their manner of presentation.  All advertising must be considered in good taste and shall uphold the aesthetic standards as determined by AATA.
>
> Advertising in or on AATA vehicles, in AATA shelters, buildings, benches or informational material which does any of the following shall be prohibited.
>
> 1. Contains false, misleading, or deceptive material.
>
> 2. Promotes an illegal activity.
>
> 3. Advocates violence or crime.
>
> 4. Infringes copyright, service mark, title or slogan.
>
> 5. Defames or is likely to hold up to scorn or ridicule a person or group of persons.

5

6.  States or implies the endorsement of a product or service by AATA.

7.  Supports or opposes the election of any person to office or supports or opposes any ballot proposition.

8.  Contains material which is obscene, as defined by MCL 752.362, or sexually explicit, as defined by MCL 722.673, and as such statutes shall be amended or supplemented.

9.  Promotes alcohol or tobacco products.

(Exhibit A, ¶¶ 44-45, and Exhibit S.)

Following Mr. Oram's rejection of Mr. Coleman's ad, plaintiff's counsel investigated AATA's policy and practice with regard to advertising on its buses.  AATA's disclosures pursuant to a public records request reveal that in recent years defendants have rejected only one advertisement other than Mr. Coleman's.  (Exhibit T.)  Furthermore, defendants evidently do not follow their own written advertising policy, as AATA buses have carried campaign ads supporting candidates for public office.  (Exhibits U and V.)  Indeed, AATA buses carry ads containing a wide variety of messages.  For example, in the past few years AATA has run ads with the following messages:

- "Every 9 ½ minutes someone in the U.S. is infected with HIV."

- "Two-Faced Landlords Can Be Stopped. Housing Discrimination Is Against the Law."

- "Domestic Violence. It happens here."

- "In Washtenaw County black babies are 3x more likely to die than white babies."

- "Breastfeeding makes babies smarter."

- An ad for NorthRidge Church that reads: "NorthRidge Church is For Hypocrites. NorthRidge Church is For Fakes. NorthRidge Church is For Liars. NorthRidge Church is For Losers."

- 2WordStory.com, a website featuring the stories of people who "experienced the life changing love and grace of Jesus Christ."

- "Joan Lowenstein for Ann Arbor's 15th District Court Judge: a
  voice of reason."

(Exhibits V, W, X, Y, Z, AA, BB, CC, and DD.)  Thus, it appears that defendants are willing to

carry ads about virtually any subject matter—regardless of whether the ad is selling a

commercial product, conveying information about important social issues, advocating the

election of candidates for public office, or spreading religious gospel.

### AATA Reaffirms the Decision To Reject Mr. Coleman's Ad

In August 2011, plaintiff's counsel contacted AATA's board of directors and defendant

Ford on Mr. Coleman's behalf and requested that they immediately run Mr. Coleman's ad.

(Exhibit EE.)  On November 17, 2011, AATA's board of directors denied that request, passing a

formal resolution "affirm[ing] the . . . decision to reject the advertisement" and, based on

AATA's advertising policy, "concur[ring] with [a] recommendation" of a subcommittee "that the

ad continue to be rejected."  (Exhibit FF.)

### LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

In ruling on a motion for preliminary injunctive relief, a district court must consider the

following factors:

> (1) the likelihood that the party seeking the preliminary injunction
>     will succeed on the merits of the claim;
>
> (2) whether the party seeking the injunction will suffer irreparable
>     harm without the grant of the extraordinary relief;
>
> (3) the probability that granting the injunction will cause
>     substantial harm to others; and
>
> (4) whether the public interest is advanced by the issuance of the
>     injunction.

*Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).  The same factors are considered on a

motion for a temporary restraining order.  *See Tocco v. Tocco*, 409 F. Supp. 2d 816, 823-24

(E.D. Mich. 2005).  Where "a party seeks a preliminary injunction on the basis of the potential

violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

**ARGUMENT**

> **Plaintiff is entitled to temporary or preliminary injunctive relief because he is likely to prevail on the merits of his claim that defendants' refusal to run his ad violates his rights to free expression and due process under the First and Fourteenth Amendments.**

As a legal matter, plaintiff's motion is straightforward, as there is already a published Sixth Circuit decision directly on point: *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998). In that case, the court granted a preliminary injunction under similar circumstances, holding that a public transit authority's content-based rejection of a bus ad violated the First and Fourteenth Amendments. The Southwest Ohio Regional Transit Authority ("SORTA") had rejected a pro-union advertisement for being controversial and not aesthetically pleasing. The Sixth Circuit determined that SORTA's advertising space was a public forum; SORTA therefore could not censor ads on the basis of their content. The Sixth Circuit further held that SORTA's advertising policy was facially unconstitutional because it was not viewpoint-neutral and it was unconstitutionally vague. As explained below, *United Food* compels the same result here.

> A.   **It is likely that plaintiff will succeed on the merits because defendants' advertising space is a designated public forum, their advertising policy is not viewpoint neutral, and the policy is unconstitutionally vague.**

There are four reasons why plaintiff is likely to prevail on the merits in this case. First, AATA advertising space is a designated public forum, meaning that the First Amendment prohibits defendants from censoring or rejecting plaintiff's ad on the basis of its content. Second, even if AATA advertising space is not a designated public forum, its advertising policy is nonetheless facially unconstitutional under the First Amendment because it is not viewpoint-

8

neutral.  Third, the advertising policy is facially unconstitutional under the Fourteenth
Amendment because it is void for vagueness.  And fourth, the policy is unconstitutionally vague
as applied to plaintiff's ad because it is not clear that the ad is actually prohibited by the policy.

> **1.    Defendants' refusal to run plaintiff's ad violates the First Amendment because AATA advertising space is a designated public forum where content-based discrimination is prohibited.**

"The Supreme Court has adopted a forum analysis for use in determining whether a state-
imposed restriction on access to public property is constitutionally permissible."  *United Food*,
163 F.3d at 349.  There are four types of forums: the traditional public forum, the designated
public forum, the limited forum, and the nonpublic forum.  *See Miller v. City of Cincinnati*, 622
F.3d 524, 534-35 (6th Cir. 2010) (describing the four types of forums).  Traditional public
forums are areas such as sidewalks and parks that "have immemorially been held in trust for the
use of the public and, time out of mind, have been used for purposes of assembly,
communicating thoughts between citizens, and discussing public questions."  *Pleasant Grove
City v. Summum*, 555 U.S. 460, 469 (2009) (internal quotation marks omitted).  A designated
public forum is any other public property that the government intends to opens up for the same
purpose as a traditional public forum.  *Id*.  A limited forum, by contrast, is public property that
may be used only by certain groups or for the discussion of certain subjects.  *Id*. at 470.  A
nonpublic forum is government-owned property that is not open for public communication at all.
*Miller*, 622 F.3d at 535.

First Amendment protections are at their apex in traditional and designated public
forums, and they are less robust in limited and nonpublic forums.  In a traditional or designated
public forum, any government restriction on the content of speech is subject to strict scrutiny.
*Id*. at 534.  In a limited or nonpublic forum, by contrast, speech restrictions may be content-

based.  *Id*. at 535.  However, even in limited and nonpublic forums, restrictions on speech must be viewpoint-neutral.  *Id*.

In *United Food*, 163 F.3d at 349-55, SORTA argued that it was permitted to exclude ads from its buses based on their content because the ad space was a limited or nonpublic forum.  *Id*. at 350.  The Sixth Circuit disagreed.  Finding that SORTA had created a designated public forum, the court invalidated SORTA's content-based exclusion of the plaintiff's ads.  *Id*. at 349-55.

*United Food* compels the same conclusion in this case for five reasons, all explained in more detail below.  First, AATA's written policy does not determine what kind of forum it has created.  *See id*. at 352.  Second, although the written policy states that it is not a public forum, defendants' actual practice is not to enforce the written policy.  *See id.* at 353.  Third, AATA runs a wide array of advertisements, including political ads and public-issue ads.  *See id.* at 355.  Fourth, defendants rarely reject ads.  *See id.* at 353-54.  And fifth, their criteria for whether an ad will be accepted or rejected are unclear.  *See id.* at 352, 354.

### a.   AATA's written policy is not dispositive.

In *United Food*, SORTA's written policy stated that its advertising space was not a public forum.  *Id*. at 352.  Notwithstanding the written policy, the Sixth Circuit held that SORTA's advertising space was a designated public forum.  *Id*. at 355.  It reached that conclusion by examining SORTA's actual practice in comparison to its written policy.  *Id*. at 352-53.

The same comparison must be made in this case.  AATA's policy (like SORTA's) states that it does not intend to open a public forum.  (Exhibit S.)  But to determine what kind of forum it actually created, the court "must closely examine whether in practice [AATA] has consistently enforced its written policy."  *Id.* at 353.  Based on AATA's actual practice, the evidence is overwhelming that its advertising space, like SORTA's, is a designated public forum.

10

**b.    AATA's actual practice is not to enforce its written policy.**

As the Sixth Circuit warned in *United Food*, "evidence . . . demonstrating that SORTA

has not consistently followed its written policy, but instead has maintained an ad hoc policy

where the acceptability of an advertisement depends on the whim of the decision-maker, . . .

would strongly suggest that SORTA has created a public forum."  *Id*. at 353 n.6.  Applying that

rule to this case, AATA has created a public forum because AATA does not consistently follow

its own written policy.

First, AATA runs political campaign ads.  (Exhibits U and V.)  Because AATA's written

policy says it prohibits advertising that "[s]upports or opposes the election of any person to

office or supports or opposes any ballot proposition" (Exhibit S), the fact that AATA accepts

such ads in practice demonstrates that it does not consistently enforce its own written policy.

Second, the one ad AATA has rejected in recent years does not violate the policy.

(Exhibit T.)  Public records indicate that defendants refused to run an ad because it depicted a

man who was not wearing a shirt.  Although their written policy prohibits obscenity or sexually

explicit material as defined by M.C.L. §§ 752.362 or 722.673, a bare-chested man does not fall

into either of those categories.[2]  It thus appears that the ad was rejected based on "the whim of

the decision-maker" or "an ad hoc policy," not a written policy that is consistently enforced.  *See*

*id.* at 353 n.6.

**c.    AATA runs a wide array of political and public-issue ads.**

The fact that AATA runs political campaign ads is important for another reason.  Because

political ads "by their very nature generate conflict," AATA's practice of accepting them

_____

[2] Exhibit T also indicates that the ad was rejected for being "controversial."  *United Food*
held that even in a limited or nonpublic forum it is unconstitutional to reject an ad for that
reason.  *Id*. at 361-62.

"signals a willingness on the part of the government to open the property to controversial speech." *Id*. at 355.

Indeed, AATA has accepted a wide array of non-commercial advertisements, including public-issue ads about HIV, domestic violence, race, breastfeeding, and religion. (Exhibits W, X, Y, Z, AA, BB, CC, and DD.) "Acceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum." *Id*. And "once [a public transit agency] permits messages of all sorts to grace its buses, it may not then select among the submitted messages based on their content." *Id*.

### d.    AATA rarely rejects ads.

AATA's creation of a designated public forum is also demonstrated by how rarely ads are rejected. Defendants rejected only one ad besides plaintiff's in the two-year period preceding the date of his attorney's request for public records. (Exhibit T.) In *United Food*, the court noted that SORTA had rejected five ads during a three-year period and found it significant that "SORTA has rejected few advertisements since [its advertising] Policy's inception." *Id*. at 354 (comparing the record to that of a Third Circuit case in which the public transit authority had "exercised its control over only three ads"). Here, too, defendants' rejection of only one other ad "suggests that [AATA] may permit virtually unlimited access to its advertising space or grants permission as a matter of course." *Id*. at 353.

### e.    AATA's criteria for allowing or prohibiting ads is unclear.

The government creates a designated public forum if its criteria for allowing or prohibiting speech in a purportedly limited or nonpublic forum are unclear. *See id*. at 352 ("[W]e will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear . . . ."). In *United Food*, the Sixth Circuit concluded that

SORTA had created a designated public forum because "the lack of definitive standards guiding the application of SORTA's advertising policy permits SORTA . . . to reject a proposed advertisement deemed objectionable for any reason." *Id*. at 354.  As explained in Subsection A.3 below, AATA's advertising policy—like SORTA's in *United Food*—is unconstitutionally vague on its face.  Therefore, its advertising space, just like SORTA's, is a designated public forum.

In sum, defendants operate a designated public forum.  Their content-based restriction of plaintiff's speech is presumptively unconstitutional, and it is likely plaintiff will succeed on the merits of this First Amendment claim.

> **2.    Even if AATA's advertising space is not a designated public forum, its advertising policy is facially unconstitutional because it is not viewpoint-neutral.**

In limited and nonpublic forums, the government may restrict speech based on content but not viewpoint.  *Miller*, 622 F.3d at 535.  Content-based restrictions disallow topics of speech, whereas viewpoint-based restrictions disallow the expression of particular messages or views about a given topic.  *See Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995).  "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."  *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc*., 473 U.S. 788, 806 (1985).

In *United Food*, the Sixth Circuit held that even if SORTA's advertising space was not a designated forum, its written advertising policy was unconstitutional on its face because it allowed for viewpoint discrimination.  *United Food*, 163 F.3d at 360-63.  In this case, AATA's written policy suffers from the same constitutional infirmity.

13

SORTA's policy was unconstitutional because it prohibited "controversial" advertisements.  The court held that the restriction was overbroad because it allowed SORTA officials to exclude ads based on the viewpoint they expressed.  *Id.* at 361.  Although the policy in some sense applied "equally" to all controversial viewpoints on any topic, it nonetheless violated the First Amendment because it favored speakers who had a non-controversial message or viewpoint about any topic over speakers with a controversial message or viewpoint about the same topic.  *Id.* at 362.  Because "it [was] the *treatment* of a subject, not the subject itself, that [was] disfavored," *id.* (internal quotation marks omitted; emphasis in original), the restriction could not be upheld even in a limited or nonpublic forum.

AATA's policy is viewpoint-discriminatory in the same way.  Although the policy does not prohibit ads for being controversial, it prohibits ads that are "likely to hold up to scorn or ridicule a person or group of persons."  (Exhibits S and FF.)  This restriction does not exclude a subject of speech; it excludes a viewpoint about subjects that may otherwise be discussed.

Plaintiff's ad reads "Boycott Israel, Boycott Apartheid," which defendants may think violates their policy's "scorn or ridicule" clause.[3]  But what will defendants do with an ad that says "Support Israel, Land of Equality"?  Such an ad expresses a different view about the same subject and is plainly not prohibited by the "scorn or ridicule" clause.  AATA's policy, by requiring or allowing defendants to display ads with some viewpoints about a subject and to reject ads with other viewpoints about the same subject, is facially unconstitutional.

Consider another example: the "Not Pro-Israel" ads sponsored by the Emergency Committee for Israel and placed on billboards and in newspapers in New York.  (Exhibits M and

---

[3] As argued in Subsection A.4 below, because it is not clear that plaintiff's ad is likely to hold up to scorn or ridicule "a person or group of persons," defendants also violate the Fourteenth Amendment by refusing to run plaintiff's ad on this basis.

N.)  Those ads display a photograph of President Obama shaking hands with Palestinian President Mahmoud Abbas and a message criticizing President Obama for not being sufficiently supportive of Israel.  Defendants might say that such ads would be prohibited on AATA buses because they "hold up to scorn or ridicule" President Obama.  But what would they do with an ad that features the same photograph and says "Thank you, President Obama, for being a friend to Palestine"?  Again, the ad expresses a different view about the same subject—a view that is not "likely to hold up to scorn or ridicule a person or group of persons."  The policy is not viewpoint-neutral.

In sum, because AATA's policy, like SORTA's, allows for the "*treatment* of a subject, not the subject itself, [to be] disfavored," *United Food*, 163 F.3d at 362, it is facially unconstitutional—regardless of whether the relevant forum is public or nonpublic.  It is likely plaintiff will succeed on the merits of this First Amendment claim.

### 3.    AATA's advertising policy is facially unconstitutional under the Fourteenth Amendment because it is void for vagueness.

In addition to being facially unconstitutional for not being viewpoint-neutral, AATA's advertising policy is facially unconstitutional under the void-for-vagueness doctrine.  Once again, *United Food* is directly on point.  *See id*. at 358-60.  SORTA's policy was held unconstitutionally vague on its face, and the same outcome is compelled here.

The Sixth Circuit described the void-for-vagueness doctrine as follows:

> Due process requires that we hold a state enactment void for
> vagueness if its prohibitive terms are not clearly defined such that
> a person of ordinary intelligence can readily identify the applicable
> standard for inclusion and exclusion.  Not only do vague laws trap
> the innocent by not providing fair warning, but laws that fail to
> provide explicit standards guiding their enforcement impermissibly
> delegate basic policy matters to policemen, judges, and juries for
> resolution on an *ad hoc* and subjective basis, with the attendant
> dangers of arbitrary and discriminatory application.  The absence
> of clear standards guiding the discretion of the public official

> vested with the authority to enforce the enactment invites abuse by
> enabling the official to administer the policy on the basis of
> impermissible factors. Quite simply, the danger of censorship and
> of abridgment of our precious First Amendment freedoms is too
> great where officials have unbridled discretion over a forum's use.

*Id*. at 358-59 (citations, internal quotation marks, and alterations omitted). If an "official's decision to limit speech is not constrained by objective criteria, but may rest on ambiguous and subjective reasons," then the policy at issue is unconstitutionally vague. *Id*. at 359 (internal quotation marks omitted).

SORTA's policy required advertisements to be "aesthetically pleasing." *Id*. at 352. Because "aesthetics is a vague term that invites subjective judgments," the Sixth Circuit held that SORTA's policy was unconstitutionally vague on its face. *Id*. at 360.

> We have no doubt that the application of the term "aesthetically
> pleasing" will substantially vary from individual to individual,
> since what is contemptuous to one may be a work of art to another.
> Since it is not susceptible to objective definition, the "aesthetically
> pleasing" requirement grants SORTA officials the power to deny a
> proposed ad that offends the officials' subjective beliefs and values
> under the guise that the ad is aesthetically displeasing. It is
> precisely this danger of arbitrary and discriminatory application
> that violates the basic principles of due process.

*Id*. (citations, internal quotation marks, and alterations omitted).

AATA's advertising policy is equally vague. It states that "[a]ll advertising must be considered in good taste and shall uphold the aesthetic standards as determined by AATA." (Exhibits S and FF.) *United Food* directly addressed the inherent vagueness of an "aesthetics" requirement. *Id*. AATA's "good taste" requirement, moreover, is no less problematic. Indeed, "good taste" is practically a synonym for "aesthetically pleasing." In *Aubrey v. City of Cincinnati*, 815 F. Supp. 2d 1100 (S.D. Ohio 1993) (which is cited by *United Food*, 163 F.3d at 359), the court had "no hesitancy" in concluding that the Cincinnati Reds' ban on baseball park banners that are not in "good taste" was facially unconstitutional because it "leaves too much

16

discretion in the decision marker without any standards for that decision maker to base his or her determination." *Id.* at 1104.  Thus, by giving officials virtually unfettered discretion to reject ads based on poor taste and undefined aesthetic standards, AATA's policy—just like SORTA's—creates a "danger of arbitrary and discriminatory application that violates the basic principles of due process." *United Food*, 163 F.3d at 360.  It is likely plaintiff will succeed on the merits of this Fourteenth Amendment claim.

> **4.    Defendants' refusal to display plaintiff's ad violates plaintiff's right to due process because the ad is not clearly prohibited by AATA's advertising policy.**

AATA's advertising policy suffers from a second major due process defect.  In addition to its "good taste" clause being unconstitutionally vague on its face, its "scorn or ridicule" clause is unconstitutionally vague as applied to the ad Mr. Coleman wishes displayed in this case.  Thus, even if the "scorn or ridicule" clause were viewpoint-neutral, it would not justify defendants' decision to reject plaintiff's ad.

The policy prohibits ads that are "likely to hold up to scorn or ridicule *a person or group of persons*."  (Exhibits S and FF [emphasis added].)  Plaintiff's ad, which levels criticism at a *country* and encourages a boycott of that country, does not hold up any "person or group of persons" to scorn or ridicule.  At most, plaintiff's ad holds up to scorn or ridicule a foreign country or its government.  Because Israel is not "a person or group of persons," defendants may not reject plaintiff's ad on that basis.

As stated above, due process requires that "prohibitive terms" be "clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion."  *United Food*, 163 F.3d at 358-59; *see also id.* at 352 ("[W]e will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear . . . .").  If speech in a limited forum is not clearly prohibited by a policy's objective terms,

then an official's decision to prohibit that speech violates due process because it is based on an impermissibly arbitrary and subjective exercise of discretion.

Furthermore, even if a regulation is not impermissibly vague on its face, it is subject to a due process challenge when its application in a particular case "failed to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Palmer v. City of Euclid*, 402 U.S. 544, 545 (1971) (per curiam) (internal quotation marks omitted); *see also United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993) (holding "multiple voting" statute void for vagueness as applied). And where the regulation in question "abuts upon sensitive areas of basic First Amendment freedoms," *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972), "a more stringent vagueness test should apply," *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

Here, the "scorn or ridicule" clause in AATA's advertising policy specifically applies to ads directed at "a person or group of persons." (Exhibits S and FF.) An ad that says "Boycott Israel, Boycott Apartheid" is directed at a country and its government's policies. If AATA wishes to include countries and governments in the list of entities that cannot be held up to scorn or ridicule by the ads on its buses, it must make that standard clear. Absent such clarity, "the acceptability of an advertisement" that criticizes a country or government "depends on the whim of the decision-maker." *United Food*, 163 F.3d at 353 n.6. Due process demands more. Accordingly, plaintiff is likely to prevail on the merits of this Fourteenth Amendment claim.

**B.    The remaining preliminary injunction factors favor plaintiff.**

Once the court determines that plaintiff is likely to succeed on the merits of his First and Fourteenth Amendment claims, a preliminary injunction is warranted. *See Miller v. City of Cincinnati*, *supra*, 622 F.3d at 540 ("Because the plaintiffs have established a substantial

likelihood of success on their free speech and void-for-vagueness claims, there appears to be no issue as to the existence of the remaining preliminary injunction factors."). The three remaining factors—irreparable harm to the plaintiff, harm to others, and the public interest—all weigh in plaintiff's favor. *See United Food*, 163 F.3d at 363-64 (finding in plaintiffs' favor on the three remaining preliminary injunction factors).

The second factor in the preliminary injunction analysis, after likelihood of success on the merits, is whether plaintiff will suffer irreparable harm without the injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris*, 888 F.3d 371, 378 (6th Cir. 1989). As demonstrated above, AATA's refusal to run Mr. Coleman's ad infringes on his First Amendment rights. Therefore, the second factor weighs in plaintiff's favor.

The third factor is whether granting the injunction will cause substantial harm to others. The Sixth Circuit has held that a party cannot claim harm from an injunction if the conduct to be enjoined violates the Constitution. *See Tyson Foods v. McReynolds*, 865 F.2d 99, 103 (6th Cir. 1989) ("Holly Farms has suffered no injury as a result of the preliminary injunction [because it] has no right to the unconstitutional application of state laws."). Here, too, AATA has no right to censor advertising on the basis of content or viewpoint, or to enforce an advertising policy that is unconstitutionally overbroad and vague on its face. Accordingly, the irreparable harm plaintiff will suffer by being deprived of his First and Fourteenth Amendment rights substantially outweighs any harm defendants will suffer by respecting them.

The final factor is whether the public interest will be served by an injunction. Again, plaintiff's likelihood of success on the merits of his First and Fourteenth Amendment claims largely disposes of the public interest factor. "When a constitutional violation is likely, . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Miller*, 622 F.3d at 540 (internal quotation marks omitted). In this case, the public interest factor weighs in favor of preliminary injunctive relief because, as demonstrated above, "a constitutional violation is likely." *Id.*

## CONCLUSION

The court should enter a temporary restraining order, preliminary injunction, or both, ordering defendants to accept and display plaintiff's advertisement on terms no less favorable than those given to other advertisers.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Dated: November 29, 2011

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2011, I electronically filed the foregoing document and its attachments with the Clerk of the Court using the ECF system; enclosed the document and its attachments with the complaint and summons being served on all defendants by registered mail with restricted delivery and return receipt requested; and served the document and its attachments on Jerold Lax (P16470), attorney for defendant Ann Arbor Transportation Authority, by email at jlax@psedlaw.com.

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)