UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLAINE COLEMAN,

        Plaintiff,

                                         Civil Action No. 11-CV-15207

vs.                                    HON. MARK A. GOLDSMITH

ANN ARBOR TRANSPORTATION
AUTHORITY, et al.,

        Defendants.

_____/

**AMENDED OPINION AND ORDER GRANTING  PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION AND
DENYING DEFENDANTS' MOTION TO DISMISS**

**I.      Introduction**

This matter is presently before the Court on Plaintiff's motion for a temporary restraining order and/or preliminary injunction (Dkt. 3) and Defendants' motion to dismiss (Dkt. 20).  For the reasons set forth below, the Court grants Plaintiff's motion and denies Defendants' motion.

**II.     Factual and Procedural Background**

**A.  Pre-Suit Activity**

Defendant Ann Arbor Transportation Authority (AATA) operates the local public transit system in the Ann Arbor, Michigan area.  AATA has a program that allows advertisers to place ads on AATA buses.  The program is administered by a contractor, former Defendant Transit Advertising Group AA (TAG).[1]  The AATA advertising policy, discussed below, governs the program.

_____

[1] Former Defendants TAG and its president, Randy Oram, were dismissed from this suit by stipulation of all parties on August 7, 2012.  See 8/7/12 Order (Dkt. 49).

Plaintiff Blaine Coleman filed the instant action challenging AATA's refusal to accept an advertisement that he submitted for display on the exterior of its buses.  The proposed ad consists of two phrases:  "Boycott 'Israel'" and "Boycott Apartheid" – with the word Israel in quotation marks.  The two phrases are separated by a graphic consisting of an insect-like figure with a skull as its head; the figure is gripping another skull in one hand and a bone in the other hand; disembodied bones and skulls float in the background:



See Compl., Attachment 1 (Dkt. 1-2).

Plaintiff contacted Defendants via email in January 2011 indicating that he would like to advertise on AATA buses, and requesting the necessary form and a copy of all applicable rules. He also attached his proposed advertisement.  Coleman email of 1/12/11 (Dkt. 46-9).  In February 2011, former Defendant Randy Oram, president of TAG, responded.  In his email to

Plaintiff, Mr. Oram included the AATA advertising policy and stated that because the policy prohibited Plaintiff's ad, TAG could not post it.  Oram email of 2/10/11 (Dkt. 46-16).  Oram's email did not specify what provision of the policy Plaintiff's ad violated.

AATA's advertising policy states:

2.10 AATA ADVERTISING POLICY

A.     The AATA, by permitting commercial advertising in or on its vehicles, shelters, informational material, buildings, and benches, does not thereby intend to create a public forum.  Further, AATA requires that such advertising comply with specified standards to further the purposes of providing revenue for AATA, increasing ridership, and assuring that AATA riders will be afforded a safe and pleasant environment.  AATA reserves the right to approve all advertising, exhibit material, announcements, or any other display and their manner of presentation.  All advertising <u>must be in considered in good taste and shall uphold the aesthetic standards</u> as determined by AATA.

B.     Advertising in or on AATA vehicles, in AATA shelters, building, benches or informational material which does any of the following shall be prohibited.

1.     Contains false, misleading, or deceptive material.
2.     Promotes an illegal activity.
3.     Advocates violence or crime.
4.     Infringes copyright, service mark, title or slogan.
5.     <u>Defames or is likely to hold up to scorn or ridicule a person or group of persons</u>.
6.     State or implies the endorsement of a product or service by AATA.
7.     Supports or opposes the election of any person to office or supports or opposes any ballot proposition.
8.     Contains material which is obscene, as defined by MCL 752.362, or sexually explicit, as defined by MCL 722.673, and as such statutes shall be amended or supplemented.
9.     Promotes alcohol or tobacco products.

Advertising Policy (Dkt. 3-21) (emphasis added).  The policy has been in place since AATA decided to permit commercial advertising on its vehicles, sometime in 2005.  Evid. Hr'g Tr. at 15.

In August 2011, Plaintiff's counsel wrote the board of directors of AATA and its chief operating officer, Defendant Michael Ford, (i) advising them of Plaintiff's position that the AATA advertising policy was unconstitutional, (ii) requesting that Plaintiff's ad be accepted, and (iii) urging that the policy be reformed.  Thereafter, the issue was presented to the AATA board. Stasiak Aff. ¶ 17 (Dkt. 19-3 at 7, CM/ECF pagination).  The board voted to reject the ad and issued a written resolution explaining its rejection.  Id. at 18 (11/17/11 Board resolution).  The resolution states, in relevant part:

> WHEREAS, [a committee of the Board] has reviewed the ACLU complaint with legal counsel, has found that at least the following stipulations from the Advertising Policy support the rejection of the advertisement in its proposed form, and has recommended that the ad continue to be rejected:
>
> 2.10    AATA ADVERTISING POLICY
>
> A.    The AATA, by permitting commercial advertising in or on its vehicles, shelters, informational material, buildings, and benches, does not thereby intend to create a public forum.  Further, AATA requires that such advertising comply with specified standards to further the purposes of providing revenue for AATA, increasing ridership, and assuring that AATA riders will be afforded a safe and pleasant environment.  AATA reserves the right to approve all advertising, exhibit material, announcements, or any other display and their manner of presentation.  All advertising must be in considered in good taste and shall uphold the aesthetic standards as determined by AATA.
> B.    Advertising in or on AATA vehicles, in AATA shelters, building, benches or informational material which does any of the following shall be prohibited.
>     5.    Defames or is likely to hold up to scorn or ridicule a person or group of persons.
>
> NOW THEREFORE, BE IT RESOLVED that the AATA Board of Directors concurs with the recommendation of the [Board committee], affirms the vendor's decision to reject the advertisement in its current form, invites the ACLU and its client to discuss the advertising policy with AATA, and requests AATA counsel to communicate the decision to the ACLU by appropriate letter.

Pursuant to the resolution, AATA's counsel advised Plaintiff's counsel of the board's decision to reject the ad.  Lax Letter of 11/17/11 (Dkt. 19-2).

4

### B.  Procedural History

On November 28, 2011, Plaintiff filed this action pursuant to 42 U.S.C. § 1983, alleging in four counts violations of the First and Fourteenth Amendments (Dkt. 1).  Count I alleges a violation of the First Amendment on the theory that Defendants operate a "designated public forum" and have unconstitutionally discriminated against Plaintiff on the basis of the content of his ad.  Alternatively, under Count I, Plaintiff alleges that Defendants operate a "limited" or "nonpublic" forum, and that they have unconstitutionally discriminated against Plaintiff based on viewpoint.  Count II makes the same allegations, but denominates this count as a facial challenge under the overbreadth doctrine.  Count III asserts a Fourteenth Amendment due process violation, under a "vagueness as applied" theory, claiming that Defendants exercised unbridled discretion in rejecting Plaintiff's ad, and that exclusion of the ad rests on "ambiguous and subjective reasons."  Count IV asserts another Fourteenth Amendment due process challenge based on vagueness, but characterized as a facial challenge, grounded in the theory that the policy grants unbridled discretion such that exclusion of advertising may rest on ambiguous and subjective reasons.

Shortly after filing the complaint, Plaintiff filed a motion for a preliminary injunction and/or a temporary restraining order (Dkt. 3), raising some – but not all – of the issues contained in his complaint.   Specifically, Plaintiff sought preliminary injunctive relief on the theory that he was likely to prevail, on the merits, on the following specific issues:

- AATA's advertising space is a designated public forum in which rejection of Plaintiff's ad on content grounds violates the First Amendment.

- Even if AATA's advertising space is not a designated public forum, the provision in its advertising policy that prohibits an ad that is "likely to hold up to scorn or ridicule a person or group of persons" is facially unconstitutional because it is not viewpoint neutral.

- The provision in the advertising policy that prohibits ads that are "likely to hold up to scorn or ridicule a person or group of persons" is unconstitutionally vague as applied because the decision to include Israel as a "group of persons" was based on an insufficiently clear standard.

- The provision in the advertising policy that requires that ads be "considered in good taste and shall uphold the aesthetic standards as determined by AATA" is facially unconstitutional on vagueness grounds.

Defendants AATA and Ford filed a response to Plaintiff's motion for injunctive relief (Dkt. 19) and, in addition, filed their own motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (Dkt. 20). Former Defendants Oram and TAG filed an answer denying the material allegations of the complaint and also joined the motion to dismiss (Dkts. 21, 22). Both motions are fully briefed. All parties initially agreed that the Court could and should rule on the motions without discovery or an evidentiary hearing, and the Court held oral argument on the motions on April 17, 2012. After oral argument, the Court consulted with the parties and determined that an evidentiary hearing was necessary regarding the reasons for the rejection of Plaintiff's ad, and the history of Defendants' enforcement of the advertising policy. See Order Re: Evidentiary Hearing (Dkt. 35). After a period of expedited discovery, the Court held a day-long evidentiary hearing on July 23, 2012, and the parties subsequently submitted post-hearing briefs (Dkts. 46, 48).

### C. Evidentiary Hearing

The evidentiary hearing was convened to afford the parties an opportunity to supplement and critique the positions that had been staked out in the motion papers regarding the reasons for the rejection of Plaintiff's ad and the enforcement history of the advertising policy. On the former issue, Plaintiff had maintained that his ad was rejected both under the "good taste" provision and the "scorn or ridicule" provision, while Defendants claimed that it had been

rejected only under the "scorn or ridicule" provision.  The Court believed that resolution of that threshold issue might limit or otherwise impact the issues that the Court would have to resolve.

The enforcement history was thought relevant, as it might bear on forum analysis.  As explained in detail below, the government's authority to impose restrictions on expression is more circumscribed in a "traditional public forum," such as a park or street, or its functional equivalent – a "designated public forum" – than in a "limited public forum," i.e., a venue that the government has reserved for certain subject matter or speakers.  See, e.g., Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469-470 (2009).  On this issue, the parties' motion papers presented sharply opposing views as to whether AATA had created a designated forum, as claimed by Plaintiff, or had created a limited public forum, as claimed by Defendants.

In his papers, Plaintiff maintained that AATA's advertising space was a designated public forum for several reasons: (i) AATA's written policy stating that it was not creating a public forum was not determinative; (ii) AATA's actual practice is not to enforce the written policy; (iii) AATA runs a wide array of ads, including political and public-issue ads; (iv) AATA rarely rejects ads; and (v) the criteria for whether an ad will be accepted or rejected are unclear. TRO Mot. at 10-13 (Dkt. 3).

Defendants responded that (i) the government's stated intent, while not dispositive, is relevant (TRO Resp. at 10); (ii) with the exception of two mistakes in 2008, AATA has rigorously enforced its own policy (id. at 12); (iii)  AATA's policy of permitting public service announcements, religious ads, and commercial ads did not create a public forum (id. at 10); (iv) AATA has rejected several proposed ads for violating its policy (id. at 11); and (v) AATA was "diligent and consistent" in applying its advertising policy (id. at 12).

At the evidentiary hearing, the parties' contentions were variously supported and undercut by the four witnesses who testified: Mary Stasiak, AATA's manager of community relations; former Defendant Randy Oram, the president of TAG; Dorrie Gabay, the deputy CEO of AATA; and Jesse Bernstein, board chairman of AATA.

Regarding the reasons for rejection of the ad, Ms. Stasiak testified that she believed Plaintiff's ad should be rejected because it "defamed or was likely to hold up to scorn or ridicule a person or group of persons specifically," and because the graphic on the ad was "frightening." Evid. Hr'g Tr. at 37.  Ms. Stasiak further testified that the frightening nature of the ad violated the purposes of the AATA policy, which she characterized as "increase revenue, increase ridership and the safety and sense of security for riders and the public."  She also testified that the ad violated the "good taste" provision "as it relates to [the purposes of the policy]."  Id. at 37-38.

Ms. Gabay testified that Plaintiff's ad violated the provisions that "all advertising must be considered in good taste" and that "it should not defame or be likely to hold . . . up to scorn or ridicule a person or groups of person."  Id. at 161.  Ms. Gabay further testified that the graphic "was not in good taste" because it "would not create a pleasant atmosphere."  Id. at 162.  Ms. Gabay stated that Plaintiff's ad also "held up to defame and it was likely to hold to scorn."  Id. at 177.  She also testified that she reviewed the ad in the context of the purposes of the policy, "to encourage ridership and for people to use buses."  Id. at 177-178.

Mr. Bernstein was asked if the board rejected Plaintiff's ad because it violated the "good taste" provision, to which he replied, "[G]enerally yes, but specifically because it defamed and held up to scorn and ridicule a group of people."  Id. at 195.  He then stated, "[F]ormally it was B5 [the "scorn or ridicule" provision] that was the overriding issue."  Id. at 196.  Mr. Bernstein

8

explained that his personal decision was based on the graphic of a skull and spider's body, and "the fact that Israel is in quotes," and he affirmed that the graphic in context of the quotation marks violated the "scorn or ridicule" provision. Id. at 209. He explained that "the quotes imply Israel doesn't exist, that it somehow demeans that group of people that are citizens of that country." Id. at 210.

Based on the testimony of the witnesses, the Court concludes that it is likely that Plaintiff's ad was rejected under both the "good taste" provision and the "scorn or ridicule" provision.

Turning to the second issue – the history of Defendants' enforcement of the advertising policy – Ms. Stasiak testified that the advertising policy has been in effect since "around 2005." Evid. Hr'g Tr. at 15. Under the general AATA procedure, Ms. Stasiak testified that she would review proposed ads and, if compliant with the policy, approve them. If she was concerned that an ad might violate the policy, she would forward it to a group of senior AATA employees for them to make the final decision. Id. at 14, 70.

Mr. Oram testified that, if TAG received proposed ads, the standard policy and procedure was for TAG to forward them to AATA for review. Id. at 92, 132. Although he gave input, the AATA group made the final decisions regarding whether to accept or reject proposed ads. Id. at 126 (stating "the final decision prevails with AATA").

Regarding AATA's history of rejecting ads, only two ads were rejected prior to Plaintiff's submission of his proposed ad. One of these ads was an ad for Jimmy John's that used the term "kick-ass," which, according to Ms. Stasiak, was rejected, at least in part, for violating the "good taste" provision of the AATA policy. Id. at 20-22. The other ad was for a Vespa motorcycle company, which had used the term "gas-hole." Id. at 72. According to Ms.

Stasiak, this ad was also rejected, at least in part, for violating the "good taste" provision.  Id. at 20-21.

Several weeks after reviewing Plaintiff's ad, AATA initially rejected an ad for StatusSexy.com, an HIV-prevention website, depicting a man naked from the waist up.  Id. at 41-45.  Ms. Stasiak's testimony indicates that this ad was rejected because the website referenced in the ad was not yet established and functioning.  Id. at 42-44 (noting that "the public cannot view it" and "the ability for me not to go to the website was a concern of mine").  Mr. Oram testified that a major concern with the StatusSexy ad's link not working was the uncertainty regarding what the website would contain when it went live.  Id. at 141-142 ("you get concerned that it might incite violence, it might hurt somebody, you just don't know so you're better off safe than sorry").  Ms. Gabay testified that an additional reason for rejection of the ad was the "good taste" provision.  Id. at 168.  Eventually, the ad was run, after the website was functioning.  Id. at 178-179.

In 2011, the board rejected, under the "scorn or ridicule" provision, an ad submitted by People for the Ethical Treatment of Animals, which asserted that the University of Michigan's animal labs were cruel.  Id. at 47.

Regarding ads run in violation of the AATA policy, there was evidence of only two such ads.  Both were ads endorsing political candidates in 2008 and were approved in violation of Section B(7) of the policy, which prohibits ads that support or oppose the election of any person to office.  Id. at 28-30.  Regarding these instances, Ms. Stasiak testified that she recalled approving only one of the ads, but that both had been submitted during a personally difficult time in her life, when two family members had died.  Id. at 75.  She acknowledged that the ads had been run in error.  Id. at 75.

10

The Court's conclusions regarding this testimony are addressed in connection with its discussion of forum analysis below.

## III.    Analysis

### A.      Preliminary Injunction Standard

In deciding a motion for a preliminary injunction, a court must consider the four traditional factors for awarding equitable relief:  (i) movant's likelihood of success on the merits, (ii) irreparable harm to movant if relief is not granted, (iii) the probability that granting the injunction will cause substantial harm to others, and (iv) whether the public interest will be served by issuing an injunction.  Six Clinics Holding Corp. v. Cafcomp Sys., Inc., 119 F.3d 393, 399 (6th Cir. 1997).  These same factors are utilized in evaluating whether to issue a temporary restraining order.  Ohio Republican Party v. Brunner, 543 F.3d 357, 361 (6th Cir. 2008).  The factors are not independent prerequisites, but rather are to be balanced against each other.  Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002).  Preliminary injunctive relief is deemed an "extraordinary remedy," which a court should grant "only if the movant carries his or her burden of proving that the circumstances clearly demand it."  Id.

In the context of the First Amendment, the central issue in determining the propriety of preliminary injunctive relief often turns on the merits of the constitutional claim:

> Notwithstanding this balancing approach, "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998).  In short, "because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is . . . whether the [regulation] at issue is likely to be found constitutional." Id. (citing Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 460 (6th Cir. 1991) (Because harm could be suffered by either party, and the public interest lay in the correct

11

> application of First Amendment principles, the court's decision turned on the likelihood of success on the merits.)); see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009) (noting that "a plaintiff's claimed harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim").

Jones v. Caruso, 569 F.3d 258, 265-56 (6th Cir. 2009).

The Court discusses each of these four factors, in turn.

### B.      Merits of Constitutional Claims

#### 1. Overview

The First Amendment guarantee of the freedom of speech has played a cherished and essential role in the life of our Nation.   Freedom of speech is a "fundamental value," Epperson v. Arkansas, 393 U.S. 97, 104 (1968), safeguarding the viability of our democracy by ensuring that our national dialogue remains robust, informed, and penetrating.   New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).   As Justice Brandeis observed:

> Those who won our independence believed that . . . freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. . . . Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law – the argument of force in its worst form.   Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

The contours of this fundamental principle have been delineated by numerous cases resolving the inevitable conflicts that have historically arisen, in various contexts, between freedom of expression and important government interests.   One such context is transit advertising, where the government's interest in attracting ridership to promote economically

12

viable transit is evaluated against an individual advertiser's speech rights.[2]   The transit cases address core constitutional issues, such as forum determination, viewpoint discrimination, vagueness, and decisionmaker discretion.   The instant case, yet another example in the transit-advertising line of cases, presents many of these same issues.

In the merits analysis that follows, the Court first discusses the standards applicable to the facial and as-applied challenges raised by Plaintiff in his motion.[3]   Next, the Court considers the proper characterization of AATA's transit-advertising forum and determines that binding Sixth Circuit precedent requires the Court to conclude that the forum is a designated public forum, given that the "good taste" provision of the policy is unconstitutionally vague.   Finally, the Court concludes that the strict scrutiny standard applicable in a designated public forum requires the

---

[2] This context was addressed by the United States Supreme Court in Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) (challenge to city's ban on all political ads on its transit system by candidate) and, since then, in several federal appellate decisions. See, e.g., Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty., 653 F.3d 290 (3d Cir. 2011) (challenge to rejection of ad pursuant to policy prohibiting noncommercial and political ads); Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 76-77 (1st Cir. 2004) (challenge to transit authority's prohibitions on ads demeaning or disparaging an individual or group of individuals and ads promoting the use of illegal goods or unlawful conduct); United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth., 163 F.3d 341 (6th Cir. 1998) (challenge to transit authority's prohibition on controversial ads and ads that are not aesthetically pleasing); Christ's Bride Ministries, Inc. v. Se. Penn. Transp. Auth., 148 F.3d 242 (3d Cir. 1998) (challenge to policy allowing transit authority to remove ads it deemed objectionable); New York Magazine v. Metro. Transp. Auth., 136 F.3d 123 (2d Cir. 1998) (challenge to refusal to display ad because of transit authority's belief that ad violated state law); Children of the Rosary v. City of Phoenix, 154 F.3d 972 (9th Cir. 1998) (challenge to city's requirement that bus advertising be limited to speech proposing a commercial transaction); Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth., 767 F.2d 1225 (7th Cir. 1985) (challenge to city's rejection of ad pursuant to unwritten policy of rejecting controversial ads).

[3] Because the Court grants Plaintiff's motion with respect to his facial challenge to the "good taste" provision based on vagueness and the as-applied challenge to the "scorn or ridicule" provision based on content discrimination, the Court will not address the other challenges raised in Plaintiff's motion (i.e., the facial challenge to the "scorn or ridicule" provision based on viewpoint discrimination and the as-applied challenge to the "persons or group of persons" language), nor the as-applied challenge based on allegedly actual viewpoint discrimination raised by Plaintiff in his post-hearing brief.

conclusion that the "scorn or ridicule" provision be found unconstitutional because it is a content restriction that does not serve a compelling state interest and cannot be justified as a "time, place, or manner" restriction.

### 2.  The Standards Applicable to Plaintiff's Facial and As-Applied Challenges

The standards governing facial challenges are different from those governing as-applied challenges.  As the Sixth Circuit has explained:

> A court may hold a statute unconstitutional either because it is invalid "on its face" or because it is unconstitutional "as applied" to a particular set of circumstances.  Each holding carries an important difference in terms of outcome: If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances.

Women's Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 193 (6th Cir. 1997).

Courts generally address an as-applied challenge before a facial challenge to increase efficiency, reduce the need to address unnecessary facial attacks, and avoid encouraging "wholesale attacks upon state and federal laws."  Connection Distr. Co. v. Holder, 557 F.3d 321, 327-328 (6th Cir. 2009) (citations omitted).  Although the general judicial reluctance to entertain facial challenges is "diminished in the First Amendment context," Roulette v. City of Seattle, 97 F.3d 300, 303 (9th Cir. 1996), facial attacks remain disfavored even in First Amendment cases because "they frequently require courts to 'anticipate a question of constitutional law in advance of the necessity of deciding it' or to 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  Holder, 557 F.3d at 336.

Nonetheless, a facial challenge may be entertained where the plaintiff can demonstrate that there are, at most, only a "few circumstances" where the challenged enactment would be constitutional:

14

> A facial challenge to a law is no small matter. At stake is not an attempt to invalidate the law in a discrete setting but an effort "to leave nothing standing," Warshak v. United States, 532 F.3d 521, 528 (6th Cir. 2008) (en banc), to invalidate the law in each of its applications, to take the law off the books completely. That, to be sure, is the fate some laws deserve—either because the defect in the law infects all or virtually all of its applications (say, a race-based classification or a law serving an unconstitutional purpose) or because the constitutional problems cannot meaningfully be severed. See, e.g., Edwards v. Aguillard, 482 U.S. 578, 585–594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); City of Houston v. Hill, 482 U.S. 451, 468–69, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); see also Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L.Rev. 235, 279–82 (1994). But before the courts will announce such a judgment, they generally insist that the claimant show one of two things: (1) that there truly are "no" or at least few "circumstances" in "which the Act would be valid," United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); see also Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008); or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications.

Holder, 557 F.3d at 335.

In his motion, Plaintiff delineates some challenges explicitly as facial challenges (viz. vagueness as to the "good taste" provision and viewpoint discrimination as to the "scorn or ridicule" provision). He also expressly delineates one challenge as an as-applied challenge (viz. the vagueness/due process challenge to the phrase "person or group of persons" contained in the "scorn or ridicule" provision). However, Plaintiff fails to denominate, as facial or as-applied, his challenge to the "scorn or ridicule" provision on grounds that it is a content-restriction in a designated public forum. Because the argument is premised to some extent on the nature of Plaintiff's ad, the Court assumes Plaintiff intended this to be an as-applied challenge. See Voinovich, 130 F.3d at 193 ("In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional.") (citation and quotation marks omitted).

As the analysis below demonstrates, there are no circumstances under which the "good taste" provision would be constitutional. Therefore, Plaintiff's facial challenge to that provision is appropriate. Similarly, his as-applied challenge to the "scorn or ridicule" provision is appropriate because, under the particular circumstances presented to the Court, the current characterization of the forum supports Plaintiff's entitlement to relief.[4]

### 3. Forum Analysis

The government's authority to restrict speech on its own property varies, to some extent, based on the nature of the forum in which the restriction is exercised. In a traditional public forum, such as streets or parks, the government may enact (i) content-based restrictions if it can satisfy the rigors of strict scrutiny, and (ii) content-neutral regulations as to "time, place, or manner" if they are reasonable, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication; however, restrictions based on viewpoint are presumptively prohibited. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983); Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469-470 (2009). As explained in Perry:

> At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also

---

[4] As explained below, the facial challenge that the Court sustains is based on the conclusion that the forum must be deemed a designated public forum because the "good taste" provision is facially vague and thus non-compliant with the requirement for "clear standards," a prerequisite for finding a forum to be a limited public forum. However, governments are free to reconstitute the forums they create. See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983) ("a state is not required to indefinitely retain the open character of the facility"). The Court expresses no view regarding the extent to which conclusions expressed in this Opinion regarding the "scorn or ridicule" provision might be modified should the Court be presented with a later argument that the forum has been reconstituted.

> enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

460 U.S. at 45 (citations omitted).

The same restrictions apply in a "designated public forum," i.e., a non-traditional forum that "the state has opened for use by the public as a place for expressive activity." Id. at 45-46. This forum has been described as one that "shares the essential attributes of a traditional public forum." Summum, 555 U.S. at 469-470.

Finally, "public property which is not by tradition or designation a forum for public communication is governed by different standards." Perry, 450 U.S. at 46. In this limited public forum, "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id.; see also Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001) (holding that a restriction in a limited public forum "must not discriminate against speech on the basis of viewpoint . . . and . . . must be 'reasonable in light of the purpose served by the forum'") (citations omitted).

A designated public forum may only be created by the intentional actions of the government. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."). To discern the government's intent, courts "look[ ] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." Id. See also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) (noting that school

facilities are deemed public forums only if "school authorities have 'by policy or practice' opened these facilities 'for indiscriminate use by the general public,' or by some segment of the public").

The Sixth Circuit undertook a forum analysis in the transit context in United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority, 163 F.3d 341 (6th Cir. 1998), the case on which Plaintiff principally relies.  In United Food, the plaintiff-union challenged the decision of a regional transit authority (SORTA) to reject the union's bus advertisement as violative of the policy's prohibitions on "advertising of controversial public issues" and advertising that was not "aesthetically pleasing."  The majority opinion concluded that the transit advertising space was a designated public forum, and that the policy prohibitions were content restrictions that failed under the strict scrutiny test. Alternatively, the majority held that, even if the forum were deemed to be a limited public forum, SORTA's application of the policy was unreasonable, because the evidence demonstrated that the rejected ad was unlikely to affect adversely the company's proprietary interests.  Id. at 358.[5]  Finally, the majority held that the facial challenges were likely to succeed on vagueness and overbreadth grounds.  Id. at 360.  It reasoned that the "controversial issues" provision was impermissibly vague because it "vests the decision-maker with an impermissible degree of discretion," id. at 359, and that the "aesthetically pleasing" provision was unconstitutionally vague because it was not susceptible to an objective definition and because it posed a significant danger of "arbitrary and discriminatory application."  Id. at 360.[6]  Notably, Judge Wellford filed

---

[5] The opinion used the term "public forum" instead of "limited public forum," the more currently used term.  This difference in nomenclature did not impact the analysis or its application to the instant case.

[6] The majority opinion further held that the ban on "controversial issue" ads was unconstitutionally overbroad because it "unquestionably allows for viewpoint discrimination."

a separate opinion, concurring in the judgment, but disagreeing with the majority's conclusion that the transit company had created a designated public forum.  Id. at 364.  He agreed with the district court, which had found that a limited forum had been created, and voted to sustain the grant of the injunction on the alternative ground that the reasons for the rejection of the ad were not reasonable.  Id. at 364-365.

Of critical importance to this Opinion is the majority opinion's treatment of forum analysis.  The majority announced that a two-step analysis should be used to determine whether the government has intentionally created a public forum:

> [T]he determination of whether the government intended to designate public property a public forum involves a two-step analysis.  First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property.  Second, we look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose.

Id. at 352.  The majority concluded that the first step had been satisfied because those seeking access to the advertising space had to obtain permission.  Id. at 353.  As to the second step, the majority opinion undertook a multi-factor analysis, but also announced a dispositive, bright-line test as to one particular factor.

The dispositive, bright-line factor concerned whether the government agency involved had operated under "clear standards":

> [I]f the concept of a designated open forum is to retain any vitality whatever, we will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum's designated purpose.

---

Id. at 361-362.  Because this Opinion will not address viewpoint discrimination, this aspect of United Food is not presently pertinent.

19

Id. at 352 (quotation marks and citations omitted).  By employing this dispositive language, the majority opinion appears to make irrelevant whether there is other evidence that might indicate that the government's intent was not to designate a public forum.

Even though that dispositive criterion had been satisfied – given the majority's later conclusion that the "controversial issue" and "aesthetically pleasing" provisions were vague – the majority nonetheless proceeded to evaluate a number of factors that it found supported its conclusion that SORTA had intended to create a designated public forum.  The majority reviewed the total number of ads rejected – six ads over the course of approximately two years – and concluded that it was unable to "readily surmise that SORTA's exercise of control over access to its advertising space operates so as to ensure that the speech is compatible with the forum's larger purpose."  Id. at 354.  The majority also considered the acceptance of a wide array of political and public-issue speech to be evidence of an intent to create a designated forum.  Id. at 355.  Finally, it found that there was "no established causal link" between its goals of attracting ridership, enhancing the transit environment, enhancing its community standing, and the restrictions on controversial and aesthetically unpleasant ads.  Id. at 354.

Judge Wellford, in his concurring opinion, disagreed with the majority's forum analysis:

Courts that have found that advertising space on transit systems has become a public forum have done so where the transit authority maintained no system of control over the ads it accepts. . . . Unlike the situation in Planned Parenthood and Coalition for Abortion Rights, SORTA has vigorously enforced its advertising policy. Not only does the policy state that SORTA advertising space is not a public forum, it makes clear that all ads are subject to SORTA's approval. Furthermore, SORTA's practice is consistent with its written policy's intent to maintain the advertising space as a nonpublic forum. Although it accepts a wide range of ads, it has also rejected various ads that did not meet the criteria outlined in the policy. . . . The majority concedes that "the Supreme Court has been reluctant to hold that the government intended to create a designated public forum when it followed a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers," see Majority Opinion ¶ 19, and that SORTA had an "apparently consistent policy of limiting access to its

20

advertising space." Majority Opinion ¶ 31. This should be dispositive of the issue, but the majority instead reaches the opposite conclusion, relying primarily on Christ's Bride Ministries, Inc. v. SEPTA, 148 F.3d 242 (3d Cir.1998), which I do not find to be persuasive.   The policies and practices of SEPTA differed materially from those of SORTA.  Unlike the majority, I find SORTA's purposes for limiting advertising were related to the forum's intended use and that SORTA has not transformed the buses into a designated public forum. See Citizens for Hyland v. SORTA, No. 98–713 (S.D. Ohio Oct. 2, 1998) (order denying preliminary injunction in case with the same defendant and indistinguishable facts).

United Food, 163 F.3d at 365.

The gist of Judge Wellford's concurrence is that the majority had departed from the essence of the Supreme Court's teaching that courts should seek to determine whether the government intended to limit access to the forum through a consistent policy and practice of selective access.   Judge Wellford also disagreed that Christ's Bride – the progenitor of the "unclear standards" factor held to be dispositive by the majority – had any application because the policies and practices there – permitting rejection of ads "for any reason" – differed markedly from those in United Food.

Indeed, the majority opinion's invocation of Christ's Bride is puzzling because that decision did not hold that "unclear standards" would mandate a finding of a designated public forum.  In Christ's Bride, the transit authority reserved "the right in its sole discretion to reject or to remove any advertisement that it deems objectionable," 148 F.3d at 251, yet that court proceeded to examine other factors – including the history of allowing "virtually unlimited access to the forum" and the written policy itself – to reach its conclusion that a designated public forum had been created.  Id. at 252.  The failure to adopt a bright-line test in that case is telling, given that a policy of allowing ad rejection "for any reason" would be the high-water mark for "unclear standards."   See United Food, 163 F.3d at 352 (characterizing the policy of allowing ad rejection "for any reason" in Christ's Bride as "the potential for government

21

censorship . . . at its greatest").[7]  Thus, <u>Christ's Bride</u> provided no precedent for adoption of a dispositive rule.

The dispositive nature of the rule is troubling because it overlooks the importance of several countervailing considerations.  It ignores the fact that there may be weighty counter-evidence of the government's intent.  It ignores, as well, that "unclear standards" may come in varying degrees of vagueness.  <u>See, e.g.</u>, <u>Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.</u>, 20 F.3d 1406, 1413 (6th Cir. 1994) ("The degree of vagueness that the Constitution tolerates depends in part on the nature of the enactment.") (citation and internal quotation marks omitted).  Thus, a marginally unclear standard might be unconstitutional, but it may not necessarily demonstrate the government's intent to create a designated public forum.  Further, given that a policy may consist of numerous provisions, any one of which may be "unclear," the <u>United Food</u> majority does not articulate how the rule would operate should the unclear standard not be the primary cause for an ad's rejection.

The majority not only failed to address any of these issues, it failed to articulate any reason why the rule should be dispositive.  Indeed, there is no clearly articulated explanation of the relevance of this rule to the forum issue to be decided, <u>i.e.</u>, a chain-of-reasoning as to how the absence of "clear standards" was probative of the government's intent to create a public forum – a failure noted in academic criticism.  <u>See</u> Marc Rohr, <u>The Ongoing Mystery of the Limited Public Forum</u>, 33 Nova L. Rev. 299, 347 (2009) ("[T]he question must be asked: why must the

---

[7] Notably, the <u>Christ's Bride</u> court rejected the argument that "unclear standards" would, as a dispositive matter, require the conclusion that a designated public had <u>not</u> been created.  <u>See</u> 148 F.3d at 252.  ("[T]he fact that the government has reserved the right to control speech without any particular standards or goals, and without reference to the purpose of the forum, does not necessarily mean that it has not created a public forum.  If anything, we must scrutinize more closely the speech that the government bans under such a protean standard.").  It is telling that the <u>Christ's Bride</u> court did not announce a dispositive rule for the converse proposition adopted by the <u>United Food</u> majority, <u>i.e.</u>, "unclear standards" mandate a finding of a designated public forum.

gatekeeper of a governmental forum be limited by definite standards, in the exercise of discretion regarding access to that forum, in order for the forum to be deemed non-public? Indeed, what does the issue of standardless discretion have to do with the ostensibly governing criterion of the government's intent to create, or not to create, an open forum?").

A theory of relevance might be that the failure to establish clear standards reflects a government that is not serious about exercising control over the forum.  But an alternative explanation of all the relevant evidence, in a particular case, may be that the government endeavored to exercise control, but simply failed to fashion a particular standard that satisfied constitutional vagueness standards, despite its best efforts to do so.  Thus, in a particular case, the unclear nature of the standards may have little or no probative value in determining the government's intent.

The various criticisms that may be lodged against the "unclear standards" rule enunciated by the United Food majority may explain why numerous courts have employed a multi-factor analysis without mentioning "unclear standards" as a factor, much less as a dispositive one.[8] Nonetheless, this Court is duty-bound to follow it.[9]

---

[8] The following cases involved speech restriction on transit advertising, where a multi-factor forum analysis was employed; none mentioned the "unclear standards" rule:

- Planned Parenthood Ass'n v. Chicago Transit Auth., 767 F.2d 1225, 1232 (7th Cir. 1985) (considering "the uses to which the property has previously been put, as well as whether the proposed speech is inconsistent or incompatible with the primary use of the government facility"; concluding that the transit authority's advertising space was opened as a public forum because the transit authority "maintains no system of control over the advertisements it accepts" and, in practice, the transit authority "has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads").

- Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 76 (1st Cir. 2004) (emphasizing the necessity that the government have an affirmative intent to create a public forum in order for a designated public forum to be opened: "[t]o determine that intent, courts must consider both explicit expressions about intent and the policy and practice of the

23

Because Plaintiff is moving for a preliminary injunction, he bears the burden of persuasion on the merits of his claim.  Leary v. Daescher, 228 F.3d 729, 740 (6th Cir. 2000). Therefore, Plaintiff bears the burden of demonstrating that the AATA advertising space is a designated public forum.  See Huminski v. Corsones, 386 F.3d 116, 154 (2d Cir. 2004) (plaintiff moving for preliminary injunction did not satisfy burden of showing governmental intent to designate government property as a public forum).

---

government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum") (citations and quotation marks omitted); but cf. id. at 103-104 ("[T]he MBTA's criteria for admission have been confusing at best, and it has always left the initial determinations of whether advertisements may run afoul of the advertising policy to the subjective evaluation of a private contractor.") (Torruella, J., concurring in part and dissenting in part).

- New York Magazine v. Metro. Transp. Auth., 136 F.3d 123, 129-130 (2d Cir. 1998) ("In order to determine the government's intention with respect to the property in which the government has accepted some speech, the Court has examined the nature of the property and its compatibility with expressive activity, as well as the nature of the restraints on speech imposed"; concluding that the defendant transit authority's advertising space was a designated public forum because "the [transit authority] accepts both political and commercial advertising" and because "the Standard that [the transit authority] used to justify discontinuing the Advertisement supports a legal characterization of [the transit authority's] action as regulatory . . . .").

- Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (9th Cir. 1998) ("[T]he Court has looked to the policy and practice of the government, the nature of the property and its compatibility with expressive activity, and whether the forum was designed and dedicated to expressive activities in determining if the government created a designated public forum.").

[9] Defendants attempt to distinguish United Food by claiming that the court "did not consider whether the buses at issue in that case were a limited public forum and restricted its analysis to the question of whether the transportation authority created a public forum."  Def. Resp. Br. to TRO Mot. at 9 (Dkt. 19).  They further argue that the Supreme Court had not yet decided Summum or Good News and thus had not yet clarified that there are three types of public forums, rather than two.  According to Defendants, "the issue of a limited public forum was not addressed and certainly not dismissed as an option by that court."  Id.  These arguments, however, are without merit.  It is true that the United Food majority used the term "nonpublic forum" in discussing what courts now refer to as a "limited public forum," but its substantive analysis regarding a "designated public forum" – a term that it did use – was not affected by the nomenclature employed.

The Court finds that Plaintiff has met that burden because the "clear standards" language utilized in United Food is dispositive in this case. It appears to require a court to find that a forum is a designated public forum if any of its standards are not clear. As explained below, this Court finds the "good taste" provision of the AATA policy to be vague because it is indistinguishable from the "aesthetically pleasing" provision that the Sixth Circuit found to be unconstitutionally vague in United Food. Therefore, the Court must conclude that Plaintiff has shown a likelihood of demonstrating that the AATA transit advertising forum is a designated public forum.[10]

If the "unclear standards" factor were not conclusive under United Food, the Court would conclude that Plaintiff has not met his burden of demonstrating a designated public forum. There was strong evidence adduced at the evidentiary hearing that AATA intended to create a limited public forum, quite aside from its written statement of intent to that effect. It created an orderly process involving several persons to review ads, with the ultimate decision to reject an ad in the hands of a committee of senior employees, rather than at the discretion of one individual, as was the case in United Food. Id. at 346-347 (noting that the general manager of SORTA decided whether to approve or reject ads). AATA staff testified, credibly, that they attempted to enforce the "good taste" provision in accordance with their understanding of the underlying purposes of the advertising policy, namely to prevent negative impacts on ridership, to increase revenue, and to ensure the safety of riders. Evid. Hr'g Tr. at 23, 177, 202. The written policy further corroborated that a detailed, even if constitutionally flawed, framework had been enacted to limit access to the forum in particular ways. Although there were only two ads rejected before Plaintiff submitted his ad, there was no evidence regarding the total number of rejections, leaving

_____

[10] There is no question that the first factor enunciated in United Food – whether permission must be granted to use the forum – has been established here, given that any advertiser must secure permission to run an ad.

the Court unable to conclude that the two rejections reflect a less-than-diligent effort to enforce standards.[11]  Similarly, the policy excluded campaign ads and ballot issue ads, indicative of an intent to enhance commercial interests, rather than open the forum to a far greater variety of ads.[12]  Further, there were only two violations of the policy, both of which were inadvertent due to the grief-stricken state of the primary AATA employee in charge.[13]

Notwithstanding this evidence – which is consistent with a governmental intent not to create a designated forum – the United Food principle that makes an "unclear standard" dispositive requires this Court to find that Plaintiff has established a likelihood of success of demonstrating that the AATA advertising forum is a designated public forum.

### 4. Vagueness

---

[11] The United Food majority concluded that the small number of ad rejections left that court unable to "readily surmise that SORTA's exercise of control over access to its advertising space operates so as to ensure that the speech is compatible with the forum's larger purpose." Id. at 354.  However, this Court cannot conclude that a small number of rejections, without more, signifies an intent to create an open forum. Here, Plaintiff failed to present any evidence regarding the total number of ads submitted, making it impossible to conclude that the number of rejections was insignificant. Moreover, Plaintiff offered no evidence why a low number of rejections might not simply reflect an advertiser pool that is knowledgeable about AATA's advertising policy such that few non-compliant ads were submitted and then rejected.

[12] The United Food court had found that "[a]cceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum" because this was "inconsistent with operating the property solely as a commercial venture." Id. at 355.  Here, there was evidence of several public-issue ads, but significant limitations, as well.  AATA accepted ads for a non-smoking campaign, Evid. H'rg Tr. at 51-52, and for awareness of housing discrimination, Ex. X to TRO Mot. (Dkt. 3-26).  Notably, the policy prohibited candidate and ballot-issue ads.  By contrast, the transit policy in United Food did not bar candidate or ballot-issue ads. Thus, this factor would weigh in Defendants' favor on the issue of intent.

[13] Plaintiff claims that Defendants' treatment of the StatusSexy.com ad – depicting a man naked from the waist up – somehow demonstrates that the forum was a designated public forum. Plaintiff claims that it was rejected for a bogus reason (obscenity), when it clearly was not obscene.  However, the ad was actually initially rejected for a number of reasons, including obscenity, lack of good taste, and the absence of a functioning website.  Moreover, it was eventually accepted and run.  This hardly constitutes significant evidence that the policy was not consistently enforced.

Plaintiff contends that the policy's requirement that ads be "in good taste and shall uphold the aesthetic standards as determined by AATA" is unconstitutionally vague. The Court agrees because <u>United Food</u> is conclusive on this issue. In pertinent part, the <u>United Food</u> court wrote:

> Due process requires that we hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. <u>See</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Not only do "[v]ague laws . . . trap the innocent by not providing fair warning," but laws that fail to provide explicit standards guiding their enforcement "impermissibly delegate [ ] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." <u>Id.</u> at 108–09, 92 S. Ct. 2294; <u>see</u> <u>also</u> <u>Leonardson v. City of East Lansing</u>, 896 F.2d 190, 196 (6th Cir. 1990). The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors. <u>See Leonardson</u>, 896 F.2d at 198. Quite simply, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." <u>Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. 546, 553, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975). We will not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights; rather, the vagueness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." <u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 770, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988). Thus, a statute or ordinance offends the First Amendment when it grants a public official "unbridled discretion" such that the official's decision to limit speech is not constrained by objective criteria, but may rest on "ambiguous and subjective reasons." <u>Desert Outdoor Advertising, Inc. v. City of Moreno Valley</u>, 103 F.3d 814, 818 (9th Cir. 1996), cert. denied, 522 U.S. 912, 118 S. Ct. 294, 139 L. Ed. 2d 227 (1997).

163 F.3d at 358-359.

<u>United Food</u> applied the above standard to conclude that language substantially similar to the language at issue in the present case was unconstitutionally vague. Specifically, the court concluded that the plaintiff was likely to succeed on the merits of its vagueness challenge to the

27

requirement that all ads "be aesthetically pleasing," 163 F.3d at 360 – language materially indistinguishable from the requirement here that '[a]ll advertising must be in considered in good taste and shall uphold the aesthetic standards as determined by AATA." The United Food court's criticism of the "aesthetically pleasing" provision at issue there applies with equal force to the language at issue in this case:

> The advertising policy's "aesthetically pleasing" requirement similarly invites arbitrary or discriminatory enforcement . . . . [A]esthetics is a vague term that invites subjective judgments. See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 510, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ( "[E]sthetic judgments are necessarily subjective, defying objective evaluation."); cf. Desert Outdoor Advertising, 103 F.3d at 818 (holding that public officials had "unbridled discretion" in deciding whether to grant a permit for erection of a sign or structure where officials could deny the permit when the structure or sign was "detrimental to the aesthetic quality of the community"). We have no doubt that the application of the term "aesthetically pleasing" will substantially vary from individual to individual, for "[w]hat is contemptuous to one ... may be a work of art to another." Smith v. Goguen, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (quotation omitted). Since it is not susceptible to objective definition, the "aesthetically pleasing" requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing. It is precisely this danger of arbitrary and discriminatory application that violates the basic principles of due process. We therefore conclude that the district court erred in determining that UFCW is not substantially likely to succeed on the merits of its facial challenge to SORTA's advertising policy on vagueness grounds.

163 F.3d at 360.

The above critique unquestionably applies to the "good taste" requirement at issue here.[14]

Therefore, the Court concludes that Plaintiff is substantially likely to succeed on the merits of his

---

[14] Defendants contend that their denial on good taste grounds was not solely because they judged the ad to be in bad taste, but rather was because "it also violated one of the subparagraphs of § B." AATA Post-Hearing Br. at 10 (Dkt. 48). Defendants' contention does not help them. If the plain language, "[a]ll advertising must be in considered in good taste," does not in fact describe a requirement that all ads must be in good taste, but rather is interpreted by Defendants to mean that all ads that are not in good taste are nevertheless permissible so long as they do not also violate another requirement of the policy, such a substantial unwritten caveat is the very definition of a situation where the "prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion."

claim that the "in good taste" and "shall uphold the aesthetic standards" requirements of the AATA's policy are unconstitutionally vague.[15]

### 5. "Scorn or Ridicule" Provision

Plaintiff contends that the advertising policy's restriction on advertising that "defames or is likely to hold up to scorn or ridicule a person or group of persons" violates the First Amendment because it is both a content restriction and viewpoint discriminatory. TRO Mot. at 14 (Dkt. 3). For the reasons that follow, the Court concludes that the "scorn or ridicule" policy is a content-based restriction that does not survive strict scrutiny, making it unnecessary for the Court to rule on the viewpoint discrimination argument.

Because the AATA advertising space is a designated public forum pursuant to United Food, Defendants must demonstrate either that: (i) the policy at issue is a content-neutral "time, place, or manner" restriction; or (ii) if it is content-based, it meets strict scrutiny. As the Supreme Court has explained:

> A [designated public forum] consists of public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

See United Food, 163 F.3d at 358-59 (citing Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).

[15] Plaintiff does not contend in his motion that the provision prohibiting ads that are "likely to hold up to scorn or ridicule a person or group of persons" is facially vague. Plaintiff does contend that this provision is unconstitutionally vague, as applied, because the decision to include Israel as a "group of persons" was based on an insufficiently clear standard. TRO Mot. at 17 (Dkt. 3). However, because the Court concludes that the "scorn or ridicule" provision unconstitutionally discriminates against speech on the basis of its content, and does not meet strict scrutiny, the Court does not reach the issue of whether this provision is also vague as applied.

Perry, 460 U.S. at 45-46 (citations omitted); see also Summum, 555 U.S. at 469-470 ("Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum.").

If the "scorn or ridicule" provision is deemed a content restriction, Defendants must demonstrate that it can survive strict scrutiny, which the Supreme Court has defined as a determination that the restriction is narrowly tailored to promote a compelling government interest, for which there is no less restrictive alternative.  U.S. v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000).

If the "scorn or ridicule" provision is content-neutral, Defendants would then have the burden of demonstrating that the provision is a reasonable "time, place, or manner" restriction, "justified without reference to the content of the regulated speech," that is "narrowly tailored to serve a significant governmental interest," and that leaves open "ample alternative channels for communication of the information."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); see also Doe v. City of Albuquerque, 667 F.3d 1111, 1134 (10th Cir. 2012) (emphasizing that the burden is on the state actor to show that the restriction serves a substantial state interest in a direct and effective way).

Here, Plaintiff argues that the "scorn or ridicule" provision is not content-neutral.  Pl. Rep. Br. at 9 (Dkt. 26).  He contends that whether an ad is allowed "depends entirely on its message," and that by a "commonsense understanding" of the term, the policy is content-based. Id.  (citing City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993)).  Plaintiff points out that strict scrutiny is a demanding standard, and argues that "increasing the use of public transportation," while legitimate, is not a compelling interest.  Pl. Resp. Br.  at 10. Plaintiff also contends that the policy is not a "time, place, or manner" restriction because it is

not narrowly tailored, or the least restrictive alternative, to further the goal of increasing use of public transit. Id.

In response, Defendants argue that the "scorn or ridicule" provision is a reasonable "time, place, or manner" restriction that is "justified without regard to the content of the speech, the person or group of persons that is the target of the speech, or the speaker." Def. Resp. to TRO Mot. at 18-20 (Dkt. 19). Defendants further argue that Plaintiff has ample alternative channels, such as online blog entries and public conferences, in which to convey his views. Id. at 19-20. Alternatively, Defendants argue that the provision survives strict scrutiny because AATA has a legitimate and compelling interest in increasing the use of public transportation, and that without the allegedly narrowly tailored "scorn or ridicule" provision, AATA's ridership and revenue would be impaired. Id. Defendants cite an article entitled "Washtenaw County Needs More Public Transit" in support of their argument that furthering public transportation is a compelling state interest. Ex. 4 (Dkt. 19-5). They also cite a report prepared by Aaron Ahuvia, professor of marketing at the University of Michigan-Dearborn, to demonstrate why the "scorn or ridicule" provision furthers the goal of promoting ridership and revenue for AATA. Ex. 3 (Dkt. 19-4).

The threshold question is whether the "scorn or ridicule" provision is content-based or content-neutral. A content-neutral provision is justified "without reference to the content of the regulated speech," Ward, 491 U.S. at 791, and is "applicable to all speech irrespective of content." Consol. Edison Co. v. Pub. Serv. Comm'n of New York, 447 U.S. 530, 536 (1980). The Supreme Court, in City of Cincinnati v. Discovery Network, 507 U.S. 410, 429 (1993), applying a "commonsense" understanding of the term "content-based," concluded that a city's policy of banning only newsracks distributing commercial handbills was content-based, because

31

whether any newsrack fell within the scope of the ban was determined by assessing the content of the publication in the newsrack.

Furthermore, the United Food court, after determining that the transit advertising space was a designated public forum, stated that "[we] think it self-evident that excluding the Union's advertisement based on aesthetics and the limited possibility of controversy fails this historically stringent [strict scrutiny] test." 163 F.3d at 355. See also Ridley, 390 F.3d at 91 (characterizing transit restriction barring "demeaning and disparaging" ads as restricting "content," even though no particular viewpoint was excluded).

Applying these standards, the Court concludes that the "scorn or ridicule" provision is content-based. Although Defendants argue that the policy is justified without regard to the content of the speech, this argument is not persuasive. To determine whether an advertisement is scornful or ridiculing, it is necessary to assess the content of the ad and the speech it conveys. The "scorn or ridicule" provision is not applicable to all speech as, for example, a size limitation on ads would be; instead, it restricts only some types of speech, depending on the message the speaker is conveying. Because under the "commonsense" view of the term, the "scorn or ridicule" provision operates by reference to the content of the speech, it must be deemed a content-based restriction.[16]

Given that the "scorn or ridicule" provision is content-based, Defendants have the burden of demonstrating that it meets strict scrutiny. Although Defendants argue that furthering the use of public transportation is a compelling interest, Defendants do not cite any legal authority for this proposition; instead, they point to one article indicating the importance of public transit.

---

[16] Because viewpoint discrimination and content restrictions are distinct concepts, R.A.V. v. City of St. Paul, 505 U.S. 377, 380 (1992) ("the ordinance goes even beyond mere content discrimination to actual viewpoint discrimination"), this Court's determination that the "scorn or ridicule" provision is content-based does not represent a finding that the provision is viewpoint discriminatory.

While public transit is surely an important governmental interest, the compelling interest standard is not easily met.  See City of Boerne v. Flores, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law. If compelling interest really means what it says . . . , many laws will not meet the test . . . .") (citations and quotation marks omitted);  Burson v. Freeman, 504 U.S. 191, 211 (1992) ("[W]e reaffirm that it is the rare case in which we have held that a law survives strict scrutiny . . ."); United Food, 163 F.3d at 355 (referring to the compelling interest test as "historically stringent").

The narrow confines of that term are demonstrated by the precious few cases where governmental interests have been found to be compelling.  See, e.g., Burson, 504 U.S. at 211 (holding that a law requiring solicitors to stand 100 feet from the entrances to polling booths survives strict scrutiny because the right to vote free from intimidation and undue influence is a compelling interest) (plurality); Grutter v. Bollinger, 539 U.S. 306, 343 (2003) ("[T]he Equal Protection Clause does not prohibit the [University of Michigan] Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body.").  Defendants cite no cases indicating that furthering public transportation is a "compelling" interest, and the Court is aware of none. Therefore, Defendants have not met their burden of demonstrating that the "scorn or ridicule" provision furthers a compelling interest.

Moreover, the "scorn or ridicule" provision cannot be justified as a reasonable "time, place, or manner" restriction.  Permissible restrictions on the manner of speech generally restrict

33

the method of speech – not the underlying content.   For example, in <u>Consolidated Edison Company</u>, 447 U.S. at 536, the Supreme Court held that:

> Thus, the essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals. No matter what its message, a roving sound truck that blares at 2 a. m. disturbs neighborhood tranquility.

In <u>Hill v. Colorado</u>, 530 U.S. 703, 719-722 (2000), the Court upheld as a reasonable "time, place, or manner" restriction a statute prohibiting people from knowingly approaching others within a certain distance of a health care facility for the purpose of speaking, showing signs, or passing out leaflets.   The Court held that this was content-neutral because it regulated only the places where speech would occur, and it applied to all speakers without reference to the content of the speech.   <u>See also</u> <u>Prime Media, Inc. v. City of Brentwood, Tenn.</u>, 398 F.3d 814, 818-819 (6th Cir. 2005) (quotations omitted) (stating it is "common ground that governments may regulate the physical characteristics of signs and billboards in much the same way that they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise.").

The "scorn or ridicule" provision is not a reasonable "time, place, or manner" restriction because it does not regulate a temporal, spatial, or physical element of the speech, or another aspect of the speech that is unrelated to content; instead, it regulates based on an aspect of the underlying expression.

For the above reasons, the Court concludes that the "scorn or ridicule" provision is a content-based restriction on speech that does not survive strict scrutiny and cannot be justified as a reasonable "time, place, or manner" restriction.

**6.  Government Speech**

34

Defendants argue that the ads run on AATA buses are "government speech."  Def. Resp. to TRO Mot. at 6-7 (Dkt. 19).  Defendants cite Summum for the proposition that the government may select the views that it wants to express when it is "speaking on its own behalf."  555 U.S. at 467.  Defendants contend that, because there is no sponsor identification in Plaintiff's proposed ad, the ad would be attributable to AATA.

Plaintiff argues, in response, that courts have never held that privately paid advertisements are government speech just because they are displayed on public property.  Pl. Rep. Br. at 7 (Dkt. 26).  Plaintiff also argues that it is universally understood that when a public transit agency displays ads of private groups, those ads contain the speech of the private group and not the government agency.  Id.  Plaintiff contends that AATA's failure to require a sponsor identification does not allow AATA to turn its ads into government speech.  Id.  Finally, Plaintiff cites Miller v. City of Cincinnati, 622 F.3d 524, 536-537 (6th Cir. 2010) for the proposition that the Sixth Circuit has rejected the argument that a private group's speech is converted into government speech just because it is expressed on government property.  Id.

The Court agrees with Plaintiff that his speech is not government speech, based on Miller, which held that private group gatherings at a city hall did not constitute government speech:

> In concluding that the Ten Commandments monument was government speech rather than private speech on government land, the [Summum] court noted that "[g]overnments have long used monuments to speak to the public" and that the public reasonably interprets "privately financed and donated monuments that the government accepts and displays to the public on government land" as conveying the government's views. Id. at 1133. See also ACLU v. Bredesen, 441 F.3d 370, 375 (6th Cir. 2006) (holding that a "Choose Life" license plate is government speech for First Amendment purposes because "the government determines [the] overarching message and retains the power to approve every word disseminated") (citing Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 560–61, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005)).

35

> Under the Court's reasoning in <u>Summum,</u> the activities that take place in Cincinnati's city hall are not "government speech." Although government speech may involve private individuals, the connection between the events that take place inside city hall under Administrative Regulation # 5 and any official government views is simply too attenuated. As we have noted, sponsoring city officials need not be involved directly in the activities that take place in city hall. Moreover, no one can reasonably interpret a private group's rally or press conference as reflecting the government's views simply because it occurs on public property.

622 F.3d at 536-537.  Employing the above analysis, the <u>Miller</u> court drew a distinction between governmental erection of monuments in public parks – which is often interpreted by the public as reflecting views of the government – and private group gatherings held inside governmental buildings, which are not so viewed.  <u>Id.</u>

Similarly, there is a difference between monuments in public parks and advertisements on public buses.  Defendants have not cited any authority indicating that the speech in ads on transit authority buses are reasonably attributable to the transit authority, and <u>Miller</u> indicates that even if private speech takes place on government property, that does not, without more, suffice to create government speech.  An additional element creating government speech might entail a long tradition of the government using the private speech to "speak to the public," <u>id.</u>, or the government dictating the "overarching message" and "retaining the power to approve every word," <u>id.</u> (citing <u>ACLU v. Bredesen</u>, 441 F.3d 370, 375 (6th Cir. 2006)).  The Court concludes that no additional element is present here and, therefore, the ads on AATA buses are not government speech.

Because the Court concludes that Plaintiff is likely to succeed on his challenges to the "good taste" and "scorn or ridicule" provisions, this merits-factor weighs strongly in favor of awarding preliminary injunctive relief.

### C.    Other Preliminary Injunction Factors

36

The remaining three factors are (i) whether there will be irreparable harm to the movant if relief is not granted, (ii) the probability that granting the injunction will cause substantial harm to others, and (iii) whether the public interest will be served by issuing an injunction.

With regard to irreparable harm to the movant, as the United Food court explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."   163 F.3d at 363 (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). Accordingly, Plaintiff's demonstration of a likelihood of success on the merits also serves to demonstrate irreparable harm if relief is not granted.  See United Food, 163 F.3d at 363.

Defendants argue that Plaintiff has not suffered irreparable harm because Plaintiff "can and has expressed his views in public and private fora in the past and where he has not suffered any retaliation for submitting the ad."  Def. Resp. to TRO Mot. at 24 (Dkt. 19).  However, Defendants' argument proves too much; given the ubiquitous opportunities for expression through the internet and otherwise, acceptance of Defendants' argument would make it virtually impossible for a First Amendment plaintiff to establish irreparable harm.  Further, Defendants' argument is precluded because the Sixth Circuit, in United Food, after considering a context very similar to the one presented here, concluded that that irreparable harm had been established.

With regard to the probability that granting the injunction will cause substantial harm to others, Defendants argue that if AATA is forced to run Plaintiff's ad, its ridership and reputation will be impaired.  Defendants have also presented a report by a professor of marketing that tends to support this position.  See Report ¶ 2 (Dkt. 19-4).  However, the Court concludes that, while such potential harm may impact the type of relief to which Plaintiff is entitled, it does not impact whether he is entitled to some relief in principle.  For example, if the Court determines that

Plaintiff is entitled to reconsideration of his ad under a revised policy that is constitutional, there may be no harm at all to the ridership.

Furthermore, First Amendment concerns must trump any potential harm to Defendants' commercial concerns. See Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment."); accord Bays v. City of Fairborn, 668 F.3d 814, 825 (6th Cir. 2012) (citing Déjà Vu, 274 F.3d at 400).

In a similar vein, the Sixth Circuit has repeatedly recognized that it is always in the public interest to prevent a violation of a party's constitutional rights. See Connection Distr. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998); Jones v. Caruso, 569 F.3d 258, 278 (6th Cir. 2010). Accordingly, where, as here, a plaintiff has demonstrated a likelihood of success on the merits, courts have consistently concluded that the public interest counsels issuance of injunctive relief.

Balancing the four preliminary injunction factors, the calculus weighs in favor of Plaintiff. Accordingly, it is clear that some form of preliminary injunctive relief is appropriate.

### D.    Relief

Having established that Plaintiff is entitled to relief at the preliminary injunction stage, the Court must determine what relief is appropriate. In his motion for preliminary injunction, Plaintiff requests that the Court enter an order directing Defendants to immediately accept and display Plaintiff's advertisement on terms no less favorable than those given to other advertisers. This is certainly a legitimate relief option. See, e.g., United Food, 163 F.3d at 346, 364 (affirming district court's issuance of an injunction requiring transit authority to accept the proposed ad). Another option could be to allow AATA to craft a new policy without the

constitutional infirmities identified by this opinion.  See, e.g., McCollum v. City of Powder Springs, Ga., 720 F. Supp. 985, 990 (N.D. Ga. 1989) ("The Court will issue an order enjoining the City Council from failing to issue a . . . license to plaintiffs unless defendant amends its ordinance so that it is constitutionally valid and acts upon plaintiffs' application pursuant to the amended ordinance . . . .") (emphasis in original).  There may be other legitimate outcomes that remedy the constitutional violation.

Although the parties touched briefly on the question of relief in their post-hearing briefs, they have not comprehensively addressed the issue.  The Court will give the parties the opportunity to address this important issue fully before specifying what preliminary injunctive relief it will order.  Accordingly, the Court directs the parties to submit to the Court their positions, along with appropriate authority, on the proper relief in the current circumstances.  The parties must also state what further proceedings are anticipated regarding any remaining issues, whether by way of discovery, motion practice, or trial.

### E.    Motion to Dismiss

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief."  Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (citations and quotation marks omitted).  Given that the claims addressed in this Opinion – the facial vagueness challenge to the "good taste" provision and the as-applied challenge to the "scorn or ridicule" provision under the current characterization of the forum – are not only plausible, but also likely to succeed, the Court denies the motion to dismiss as to those claims.[17]

---

[17] To the extent that Defendants invite the Court to convert their Rule 12(b)(6) motion to dismiss into a motion for summary judgment pursuant to Rule 56 – a motion they did not file, even in the

Regarding the other issues raised by Defendant's motion to dismiss and not addressed in this Opinion (<u>i.e.</u>, viewpoint discrimination and the as-applied vagueness challenge to the "persons or group of persons" language), the Court will determine whether such issues remain to be adjudicated after it reviews the parties' forthcoming supplemental briefs. Therefore, it would be premature for the Court to rule on the balance of any issues raised by the motion to dismiss at this time. Because the Court has discretion to postpone an ultimate decision on the issues raised by a motion to dismiss, <u>see</u> Fed. R. Civ. P. 12(a)(4)(A) (allowing postponement of decision until trial), the Court will deny that aspect of Defendants' motion without prejudice, subject to renewal at a later point in the proceedings.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for temporary restraining order and/or preliminary injunction (Dkt. 3) is granted; Defendants' motion to dismiss (Dkt. 20) is denied. Plaintiff shall file his brief on remedy and further proceedings on or before October 14, 2012. Defendants shall file their response brief within fourteen days of the service of Plaintiff's brief. The briefs shall not exceed ten pages, exclusive of attachments. The Court will determine whether a hearing will be required.

---

alternative – the Court declines. Defendants' motion was filed at a very early stage of this case, prior to the taking of any discovery. Although the parties have since conducted limited discovery at the Court's direction on two particular issues, Plaintiff has opposed any potential conversion of the motion on the ground of desiring the opportunity for further discovery, and the Court will not undertake an ultimate ruling on the merits where full discovery is not yet completed. See <u>Kolley v. Adult Protective Servs.</u>, 786 F. Supp. 2d 1277, 1286-87 (E.D. Mich. 2011).

SO ORDERED.


Dated:  November 15, 2012                    s/Mark A. Goldsmith
        Flint, Michigan                      MARK A. GOLDSMITH
                                             United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 15, 2012.


                                             s/Deborah J. Goltz
                                             DEBORAH J. GOLTZ
                                             Case Manager